In re CLAIRFIELD LUMBER CO.

(District Court, E. D. Kentucky.   August 29, 1911.)

No. 574.

1. BANKRUPTCY (§ 140*)—SALES—WHEN TITLE PASSES TO PURCHASER—CONSTRUCTION OF CONTRACT—SALE OF LUMBER TO BE MANUFACTURED.

Claimant entered into an executory contract with bankrupt, which was the owner of a sawmill, for the purchase of lumber of stated kinds, grades. and prices, to the value of over $60,000, to be manufactured by bankrupt and delivered f. o. b. cars at its mill.   By the terms of the contract bankrupt agreed to manufacture at least $30,000 of lumber to apply on the contract within three months and to stack the same.   Before delivery bankrupt was to measure and inspect the lumber and grade it in accordance with the rules of the National Hardwood Association. Claimant agreed to and did within the three months advance to bankrupt $30,000, to be repaid by applying thereon one-half of the price of the lumber as delivered, paying cash for the other half.   *Held* that, under the contract, title did not pass to claimant until the lumber was measured and inspected, and that lumber which had been cut by the bankrupt to apply thereon in accordance with its terms, but which at the time of bankruptcy was still stacked in the yard, and had not been measured nor inspected, remained the property of the bankrupt, and passed to his trustee.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

2. SALES (§ 199*)—TRANSFER OF TITLE—INTENTION OF PARTIES.

The fundamental proposition in determining when the title to personal property, which is the subject-matter of a contract of sale, passes from

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes*

the seller to the buyer, is that it depends on the intention of the par-ties, to be gathered from the contract, if not expressly stated then by inference or presumption from its terms.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 516–523; Dec. Dig. § 199.*]

3. EVIDENCE (§ 441*)—PAROL EVIDENCE TO CONTRADICT WRITING—RULE OF EXCLUSION.

The rule that a contemporaneous parol agreement cannot be shown to contradict the terms of a written contract applies as well to the im-plied as to the expressed terms of such contract.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2030–2047; Dec. Dig. § 441.*]

4. SALES (§ 200*)—TRANSFER OF TITLE—APPROPRIATION OF LUMBER ON CON-TRACT.

Where an executory contract for the sale of lumber of stated kinds and quality to be manufactured by the seller required that the lumber should be inspected under certain rules and measured before delivery, the mere fact that the parties went through the millyard where lumber which had been cut by the seller to apply on the contract was stacked and estimated the quantity, and that the buyer directed that it be ship-ped, did not do away with the requirement of inspection and measure-ment, nor operate as an appropriation of the lumber then in stack to the contract so as to pass title thereto to the buyer.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 524–528; Dec. Dig. § 200.*]

In the matter of the Clairfield Lumber Company, bankrupt. On claim of the Gage Lumber Company to certain lumber. Claim denied.

C. L. Marsilliot, for Gage Lumber Co.

E. S. Jouett, for Clairfield Lumber Co.

COCHRAN, District Judge. This cause is before me on a con-troversy between the Gage Lumber Company, hereafter referred to as the Gage Company, a corporation engaged in the lumber business at Providence, R. I., and the trustee in bankruptcy, M. T. McEldowney. The bankrupt is a Kentucky corporation, whose principal office was at Winchester, in this district, and which, for something over a year prior to September 7, 1907, the date of the filing of the petition in bankruptcy, had owned and operated a sawmill, erected by it, at Clair-field, Clairborne county, Tenn. The controversy relates to lumber sawed and stacked by the bankrupt at its sawmill, most of which was still in the stack at the beginning of these proceedings. On the same day that the petition in bankruptcy was filed, insol-vency proceedings against the bankrupt were begun in the proper state court of Tennessee, and one J. H. Bartlett was appointed re-ceiver therein. September 9th he took possession of the assets of the bankrupt, including all its lumber stacked in its yard at Clairfield. Thereafter the Gage Company, claimant herein, brought an action in replevin in the proper state court against the receiver to recover certain of the lumber which he had thus taken possession of on the ground that it, and not the bankrupt, was the owner thereof. The lumber thus claimed by the Gage Company was considerably less than one-half of the lumber stacked in the yard on September 7th and

taken possession of by the receiver, as I make it not over a fifth or sixth of the entire quantity. Upon the appointment of McEldowney as trustee in bankruptcy, the receiver surrendered possession of the lumber taken possession of by him, including that claimed by the Gage Company in its action of replevin, and the other assets of the bankrupt to him, and by consent the assertion of its claim thereto was transferred to this court. Thereafter the trustee sold all the lumber that came into his hands, including that so claimed by the Gage Company, to it for certain prices upon the agreement that, in the event it should be determined that it was the owner of that portion thereof so claimed by it, it would not pay therefor, but that otherwise it should account to the trustee for the prices at which it had been taken. The sale came to $24,915.64, and that in controversy to $7,485.16.

But the lumber so claimed by the Gage Company is not all the lumber so sawed and stacked in controversy herein. On and after August 30th down to and including September 6th, the day before the filing of the petition in bankruptcy, the bankrupt delivered to the Gage Company six car loads of lumber that had been so sawed and stacked, and on September 9th after the filing thereof, and before the receiver on that day took possession, delivered to that company a small quantity in addition, as I make it, parts of two car loads. It was delivered in pursuance of a written executory contract of sale entered into between the Gage Company and the bankrupt on September 6, 1906, on which the former had made an advance. This lumber is also in controversy herein. The trustee claims that the Gage Company should account to him for the prices at which it was taken. This the Gage Company denies on the ground that it was the owner of the lumber at the time of the delivery. This is the only real ground on which it can claim that lumber delivered on September 9th after the filing of the petition in bankruptcy, and it is the only practicable ground on which it can claim that lumber delivered before as, if it was not the owner thereof at the time of delivery, there is no room to claim that the delivery thereof was not voidable as a preference. The controversy, therefore, as to this lumber is the same as that as to the lumber not delivered and still in the stack at the time of the beginning of these proceedings. It is as to the ownership thereof at the time of the delivery as, in the case of the other, it is as to the ownership thereof at the time the petition in bankruptcy was filed. The matter of ownership of both depends upon the same considerations.

The plaintiff bases its claim to ownership of all the lumber in controversy on three grounds. One is the written executory contract of sale on September 6, 1906, hereinbefore referred to. The form of that contract is a written offer or order addressed to the bankrupt accepted by it in writing. The second ground is a verbal agreement claimed to have been made by the parties on the same occasion when the executory contract of sale was entered into. The third ground is certain happenings in 1907, on two occasions in June in bankrupt's lumber yard, one in the last week in August in Cincinnati, and one on September 2d in bankrupt's lumber yard again. These three positions are hardly consistent with each other, though probably the first

and third are. Possibly these two should be treated as one, but, in order to determine the value of the first by itself, I will deal with them separately. When I come to deal with the third one, I will consider it in connection with the first, as, indeed, it must necessarily be. I will take these positions up, and dispose of them in the order in which I have stated them.

[1] 1. The contract of September 6, 1906, was, as stated, an executory contract of sale by the bankrupt to the Gage Company. It was for the sale of certain lumber thereafter to be manufactured by it at certain prices. It did not concern lumber then in existence, but lumber thereafter to be produced by manufacture by the bankrupt at its sawmill at Clairfield then, but lately erected and put into operation. The lumber covered by it was poplar, oak, and ash of different grades and sizes—i. e., thickness and widths—the prices varying according to the kinds and grades. The prices were "f. o. b. Clairfield, Tennessee"; i. e., the bankrupt was not only to produce the lumber, but it was to deliver it on board cars at Clairfield. Before it was delivered, the bankrupt was to measure and to ascertain its price and to inspect it according to the rules of the National Hardwood Association, to determine whether it was, in fact, such lumber as was covered by the contract. By it the Gage Company was to advance the bankrupt $30,000 on account of the purchase price of the lumber in four months paper, $10,000 simultaneously with the execution of the contract, $10,000 October 1st, and $10,000 November 1st, which term of the contract was duly complied with by the Gage Company. The bankrupt on its part agreed "to have put on sticks during the month of September at least $10,000 worth of lumber to apply on" the "contract, during the month of October at least $10,000 worth additional to apply on" the "contract" and "to have an additional $10,000 worth of lumber on sticks by December 1st making a total of $30,000 worth of lumber which has been put on sticks to apply on" the "contract." This agreement on the part of the bankrupt seems to have been the moving cause of the agreement on the part of the Gage Company to make the advance. In the writing the former was followed immediately by the latter. The latter was introduced by the words "We hereby agree," and the former by the words, "You agreeing at the same time." This advance was to be repaid, not by the purchase price of the whole of the lumber as it was thereafter delivered, but by the purchase price of one-half thereof only, the other one-half to be paid in cash. The wording of the writing on this matter is:

"We hereby agree to pay one-half cash on each invoice as rendered, the balance to apply on payment of notes given. The same shall continue in this manner until this said advance has been paid in full."

The contract covered more lumber than would in this way repay the advance; i. e., more than $60,000 worth of lumber at the contract prices, just how much I am unable to say, as the full contract is not before me, and, after so providing, the contract continued: "After which your invoices will be paid in full." The contract said nothing as to when the lumber sold other than the $30,000 worth was to be sawed and put on sticks—i. e., stacked—nor anything as to when any

of it was to be delivered.  I take it that the rest of the lumber was to be sawed and stacked within a reasonable time after the sawing and stacking of the $30,000 worth, that it was all to be delivered as ordered by the Gage Company, and that it was to order same within a reasonable time after it became seasoned and ready for delivery if not as it became so; the seasoning period being from 60 to 90 days after it was stacked.

The bankrupt had at that time sawed and stacked some lumber, but evidently not much.  In stacking that which it had theretofore sawed and that which it thereafter sawed, regard was had to its kind, grade, and thickness, and possibly also to its width and length.  It was so stacked that, when an order was received for lumber, all that had to be done was to go to the stack containing lumber of the specific description called for, and fill the order without disturbing other lumber; i. e., lumber not of that specific description so as to get at it.  Each stack was marked so as to show the grade and thickness of the lumber contained in it.

The bankrupt had delivered to purchasers before the receiver took possession 153 car loads of lumber, 13 in the year 1906, and 140 in the year 1907.  Of these it had delivered to the Gage Company on its contract of purchase 65 car loads, 5 in the year 1906 and 60 in the year 1907.  It seems from the date of the delivery of the five car loads delivered to it in 1906 that none of it was lumber that had been sawed or stacked after the making of the contract of September 6th, but came out of lumber previously sawed and stacked.  If it was lumber that had thereafter been sawed and stacked, it was delivered before it was thoroughly seasoned.  The 60 cars delivered in 1907 include those delivered on or after August 30th, which are in controversy herein.  The lumber as delivered by the bankrupt outside of that delivered on or after August 30th came to $21,085.60, and that so delivered to $3,500.47, making the total delivered come to $24,586.-07.  As heretofore stated, the lumber in the yard at the time the receiver took possession and which was afterwards surrendered to the trustee, and by him sold to the Gage Company, came to $24,915.16, of which that in dispute came to $7,485.16 at the prices fixed by the contract of September 6, 1906.  The quantity so sold exceeded 1,000,-000 feet, and that in controversy was less than 200,000 feet.  It was therefore the best lumber in the yard.  It was all the lumber that was there of the description called for by the contract of September 6, 1906.  Adding the purchase price of the same to that of the quantity that had been delivered makes a total of $32,071.23.  Unless, then, the bankrupt had delivered to purchasers other than the Gage Company lumber of the description covered by its contract, it had after the making thereof sawed and stacked but little, if any, lumber in excess of the $30,000 worth which it had agreed to saw and stack, though it had not done so by December 1, 1906.  The ground upon which the Gage Company claims that it was the owner of the lumber in controversy herein under and by virtue of the written contract of September 6, 1906, is that it was such lumber as was called for by the contract and had been sawed and stacked to apply to it.  I

think that it is to be taken that it was so sawed and stacked, and that quite likely it is largely, if not entirely, a part of the $30,000 worth of lumber which it had agreed to saw and stack for that purpose by December 1st, but which it had not done. In disposing of this feature of the case, I will take it that this is so, or, to put it most favorable to the Gage Company, I will treat it as if $30,000 worth of lumber had been sawed and stacked to apply on its contract by December 1st, and that in controversy was a part thereof. In such a state of case would the claimant have become the owner thereof as soon as same was sawed and stacked?

[2] The fundamental proposition in determining when the title to personal property which is the subject-matter of a contract of sale passes from the seller to the buyer is that it depends on the intention of the parties. It passes when, and not until, they intend it shall pass. Where, then, the intention on this subject is expressly stated in the contract, there is no difficulty in determining when the title passes. It is only where there is no express statement on the subject, as here, that there is any difficulty. In all such cases the question still is as to what the intention of the parties was, and the question as to when the title passes is settled in accordance with what that intention is taken to have been. There may be terms or expressions in the contract from which a reasonably fair inference as to what the intention was can be drawn. The intention so inferred is controlling. Or these, as well as express statements as to what the intention is, may be lacking, and it may be a pure matter of presumption as to what the intention was. Here the intention so presumed is controlling. In every case, then, that can arise it is the intention of the parties stated, inferred, or presumed that governs. In the case in hand, the intention is not expressly stated. That much is certain. The only terms in the contract from which it is possible to say that the intention is inferable is that as to the advance, and that as to the sawing and stacking $30,000 worth of lumber by December 1st to apply on the contract. With that out of the way, the question of intention would be one of presumption solely. I think the orderly way in which to consider the question now in hand is to determine, first, what the presumption as to the intention of the parties to the contract in question as to when the title to the lumber covered by it was to pass would be with those terms out of the way, and then to determine their effect.

Different situations may exist calling for determination of the presumption as to the intention of the parties as to when the title to personal property, which is the subject-matter of a contract of sale between them, is to pass. It is not important to refer to any except such as has the property still in the possession of the seller, and not yet delivered by him to the buyer. Cases of this sort may be divided into three classes: Those where the property is in existence and identified in whole or in part; those where it is not identified in whole or in part and is not necessarily not in existence; and those where it is not in existence and is thereafter to be produced—either manufactured or grown—by the seller. The rules as to the presumption

of intention are ordinarily laid down in connection with cases of the first class. Here several different situations may exist. The property may be wholly identified, the terms of the contract may all be definitely fixed, and nothing remain to be done but for the seller to deliver and the buyer to pay. The property may be wholly identified, the price may not be definitely fixed, but to be fixed by the seller by counting, weighing, or measuring before delivery. Such a situation as this may also have an added circumstance that the property before delivery is to be inspected to determine whether it is really such as is called for by the contract, or possibly this circumstance alone may be the sole differentiating circumstance in the situation. Again, though the property may be wholly identified and price definitely fixed, yet the property may not be fit for delivery. Something has to be done by the seller to place it in a deliverable state. And, again, the property may not be wholly identified as being part of a mass of things, which may be of uniform or unequal quality, in the one instance calling for mere separation and in the other for selection as well as separation. Now, I understand the law to be that in such cases, except the first one, the presumption is that the title does not pass before the doing of the things that remain to be done, and in that case the presumption is that it passes before delivery upon the bargain being struck. In the second situation the presumption is that the title does not pass before the fixing of the price by counting, weighing, or measuring, even though there is to be no inspection; the fact that there is to be an inspection being an additional consideration for the title not passing at the time the contract is made. This presumption in these several instances I understand to be a conclusive presumption in the absence of any express statement as to intention or anything from which it can be inferred. There is some conflict in the authorities as to the presumption in the second situation above referred to where there is to be no inspection; i. e., where the property is wholly identified, and the only thing to be done is for the seller to fix the price by counting, weighing, or measuring before delivery, and in the fourth where the things in the mass are of uniform quality, and nothing but mere separation is called for, but the decided weight of authority is to the effect stated. Such is the law as laid down by the Supreme Court of the United States and of Tennessee, the only two jurisdictions concerned here, as to the second situation, where both the fixing of the price by measurement and an inspection is called for before delivery.

The second and third class of cases above referred to are alike, in that there is no identification of the property which is the subject-matter of the contract of sale at the time of the making thereof. In the third class, in the nature of things, as the property is thereafter to be produced, there is no such identification. Identification is impossible until it is produced. It is to this class that our case belongs. In such cases it would seem that if, after the production of property of the character which is the subject-matter of the contract of sale, any of the things remains to be done, before the doing of which the presumption is that the title to property in existence at the time of

the contract does not pass, the presumption is that the title does not pass until the doing thereof. If the doing of such things is essential to the passage of title to property in existence at the time of the contract, a fortiori the doing thereof is essential to the passage of title to property not then in existence, but thereafter to be produced by the seller. Where the subject-matter of the contract of sale is property in existence and identified, the alternative is presented as to whether the title passes at the time of the contract or thereafter at some time in the future. Where the subject-matter of the contract of sale is property not then in existence, but thereafter to be produced by the seller, no such alternative is presented. The alternative is presented between the two times in the future—the time of production or the time of the doing of such thing. If the future time is, as against the present time, taken to be the time of the passage of the title in the former case, certainly the same future time as against the earlier future time ought to be taken to be the time of the passage of the title in the latter case.

The classification given above and the positions taken I have gathered from 1 Mechem on Sales, c. 1 to 5, inclusive, in book 2. I do not mean that the matter is stated there just as I have stated it. I mean that my statement is based on what is there given. I am not sure that I have put it exactly right in all instances, as I have not sufficiently reflected on it to be sure of the correctness of every statement I have made. The decisions bearing on the passage of title to personal property which is the subject-matter of a contract of sale are so numerous as to forbid consideration of them in detail, except in so far as they have been cited and relied on by counsel. Those decisions will be referred to later. It must then be held that if the contract of September 6, 1906, contained nothing as to the Gage Company making any advances, and as to the bankrupt sawing and stacking $30,000 worth of lumber by December 1st to apply on the contract, the Gage Company did not acquire title to the lumber on hand at the time of the filing of the petition in bankruptcy, and that it did not acquire title to that theretofore delivered to it before the doing of the things necessary to determine its price, and that it was such lumber as was called for by the contract; i. e., before the measurement and inspection.

What, then, is the effect of the terms of the contract as to making the advance and as to sawing and stacking $30,000 worth of lumber to apply on the contract? Do they rebut the presumption otherwise that the title was not to pass before the lumber was measured and inspected? Is it to be inferred therefrom that it was the intention of the parties that the title to the lumber sawed and stacked by the bankrupt which was of the character called for by the contract, and which was sawed and stacked to apply on the contract, was to pass to the Gage Company before it was measured and inspected, and as soon as it was stacked?

Take first the matter of the advance. That made it the creditor of the bankrupt. Its indebtedness, however, was not to be paid in money. It was to be paid in lumber, and in lumber which the bankrupt would

be aided in producing by the advance. This undoubtedly was a consideration calculated to awaken a desire on the part of the Gage Company to a certain extent at least that the lumber so produced and so applicable should, as soon as it had been produced and stacked, become its property, so that no one else could interfere with its right to have it applied on its debt. Just how strong the desire would be would depend somewhat on how it regarded the financial standing of the bankrupt to be. Possibly, as it was just beginning business, it might have been thought to be better than it would otherwise have been. But there was a counter consideration calculated to awaken desire on its part that the lumber so produced and applicable should not become its property before delivery on board the cars, and that was its possible destruction by fire. The complete control and disposition of things at the sawmill was in the hands of the bankrupt. One would hardly like to run the risk of such severe loss under such circumstances. Point is made of the fact that the bankrupt did not have the lumber in controversy insured. As it was looking after the lumber, it may have relied on its oversight to protect it from loss. It is much more significant that the Gage Company, who had to rely on others saving it from loss by preventing a fire or putting it out as soon as possible if it occurred, did not have it insured if it owned it after it was stacked. I think this consideration sufficient to counterbalance, if not to overthrow, the other.

I find nowhere that it has been held that an advance payment on the purchase price of personal property, the subject-matter of a contract of sale, is sufficient in and of itself to affect the passage of title thereto. And it is to be noted here that the advance was not to be repaid by the entire purchase price of the lumber as it was thereafter delivered, but only by one-half thereof. The other half of the purchase price was to be paid to the bankrupt in cash. If the Gage Company was willing to forego this half of the purchase price, the payment of which would much sooner reinstate it, is there any likelihood that it desired to acquire the ownership of the whole lumber in advance of its delivery to it?

Take, then, the matter as to sawing and stacking $30,000 worth of lumber by December 1st to apply on the contract. I fail to see in this anything but a desire to hasten the delivery of $30,000 worth of lumber. It is simply a provision that the bankrupt should have that much lumber ready for delivery on the contract by December 1st or as soon thereafter as same became seasoned. It covered only enough lumber to pay one-half of the advance on the contract. No provision whatever was made as to sawing and stacking the other $30,000 worth of lumber whose delivery would be essential to pay back its advance in full. It is left just as the excess of the lumber covered by the contract over and above the $60,000 worth essential to reimburse it for its advance is left; i. e., without any provision whatever for its sawing and stacking. The only difference then between the first $30,000 worth and the second $30,000 worth and the excess over $60,000 worth is that the first $30,000 is to be sawed and stacked by December 1st.

If the lumber which was the subject-matter of the contract had been in the bankrupt's lumber yard at the time of the making of the contract, instead of having thereafter to be produced, and hence was in existence and identified under the rules above stated, the presumption would be that the title thereto was not to pass before it was measured and inspected. How, then, is it possible to say when it was not in existence and identified, but was thereafter to be produced, that it was to pass before the doing of those things simply because of a provision in the contract that $30,000 worth of lumber was to be produced and stacked to apply on the contract by December 1st?

I therefore conclude that those terms have no effect on the question as to when the title was to pass; i. e., they do not change matters from what they would have been had not those terms been in the contract. Counsel for the Gage Company cite the following authorities in support of its contention herein, to wit: McCarty v. Blevins, 13 Tenn. 195, 26 Am. Dec. 262; Potter v. Coward, 19 Tenn. 22; Goodrum v. Smith, 22 Tenn. 542; Shaddon v. Knott, 32 Tenn. 359, 58 Am. Dec. 63; Rawls & Griffis v. Patterson, 60 Tenn. 373; Williamson v. Steel, 71 Tenn. 527, 31 Am. Rep. 652; Barker v. Freeland, 91 Tenn. 112, 18 S. W. 60; Mayberry v. Lilly Mill Co., 112 Tenn. 564, 85 S. W. 401; Williston on Sales, p. 309; Young v. Mathews, L. R. 2 C. P. 127; Audenreid v. Randall, 3 Cliff. 99, Fed. Cas. No. 644; Southwestern F. & C. P. Co. v. Stanard, 44 Mo. 71, 100 Am. Dec. 255; Martz v. Putnam, 117 Ind. 392, 20 N. E. 270; Riddle v. Varnum, 20 Pick. (Mass.) 280; McElwee v. Met. Lumber Co., 69 Fed. 302, 16 C. C. A. 232; Kingsley v. White, 57 Vt. 565; Barber v. Thomas, 66 Kan. 463, 71 Pac. 845; Trigg v. Bucyrus Co., 104 Va. 79, 51 S. E. 174; Andrews v. Grimes, 148 N. C. 437, 62 S. E. 519.

I am dependent as to some of these cases on counsel's brief for the points involved and decided in them. I will consider the Tennessee cases together. The first four, to wit, McCarty v. Blevins, Potter v. Coward, Goodrum v. Smith, and Shaddon v. Knott, are alike, in that in each case the contract of sale covered specific personal property and fixed the purchase price. There was nothing to be done by the vendor but to deliver. It was held that the title passed before delivery. In the McCarty v. Blevins Case the specific personal property which was the subject-matter of the contract, to wit, a colt, was not in existence, and it was held that the title passed when it came into existence. This is the only one of all of them where the property was not in existence when the contract was made. In the Rawls & Griffis v. Patterson Case there had been a delivery not to the vendee, but to his agent. It was held that the title passed on the delivery, though the property which was the subject-matter of the contract, to wit, two bales of cotton, was yet to be ginned, separated, and weighed. There is nothing decided in Williamson v. Steel that is of any consequence in this case. It is cited because of a dictum in the opinion, which is to the effect that in a sale of two bales of cotton out of a crop of cotton to be gathered, prepared for the market, and delivered a delivery is not essential to the passage of title. It will pass before delivery if the two bales have been selected and set apart for the

vendee by the vendor. In the case of Barker v. Freeland the subject-matter of the contract was 40 acres of potatoes, and the vendor agreed to deliver them at the depot. It was held that title passed on the making of the contract, and not until delivery. The basis of the decision was the existence of circumstances, to wit, provisions in the contract, from which it was inferable that the title was to then pass. Judge Lurton refers to them in these words:

"The circumstances of this case to be observed in this connection are these. The fact that complainant bought a crop in the field; that he was to have his own agent attend to the filling and sewing of the sacks; that he selected his own vehicles for containing the goods; and that in the field they were put into his own bags."

The decision in Mayberry v. Lilly Mill Co. is not relied on as the point decided is not stated. A quotation from the opinion to the effect that the intention of the parties "is always controlling" is all in the case that is relied on. I fail to find anything in any of these Tennessee cases at all against any position I have taken or supporting the Gage Company's position that before inspection and measurement title to the lumber in question passed to it. And in the quotation from the opinion in Mayberry v. Lilly Mill Company occurs these words:

"Ordinarily when anything remains to be done by the seller or purchaser, as where delivery contracted for is not made or where the property sold is not set apart from other property of like character, or where measurement is necessary to ascertain the purchase price, the contract is incomplete and executory and the title remains in the former."

The opinion in the Tennessee case of Hardwick v. American Can Company, 113 Tenn. 657, 88 S. W. 797, cited by counsel for the trustee, states the matter as well as it is possible to put it. After noting that there are two classes of contracts in which the subject-matter thereof is existing personal property, to wit, a bargain and sale, where the title passes on the making of the contract and an executory agreement where it passes thereafter, and indicating what is a bargain and sale, the opinion proceeds:

"This is a bargain and sale as distinguished from an executory agreement. Benj. on Sales, 213. The latter contemplates that something is to be done to complete the sale, such as weighing, selecting, delivering, or other act, and is converted into a bargain and sale by the appropriation in the mode agreed upon of specific goods to the contract. In either case, as soon as the specific goods sold are ascertained, either by the original contract or subsequent appropriation, the property vests in the buyer without payment, if no condition be annexed to the contract."

In this case no lumber can be said to have been appropriated—I am now leaving out of consideration the happenings relied on as constituting the third ground upon which the property in controversy is claimed—to the contract until inspected and measured. The stacking of the lumber upon a rough inspection of it as it came from the saw as of the character called for by the contract and for the purpose of applying it thereon was not an appropriation thereof to the contract. It was not so appropriated, at least until, upon an inspection under the rules of the National Hardwood Association, it was found to be such

as was called for by the contract, and was measured to ascertain its price. This exhausts the Tennessee authorities.

The quotation from Williston is simply to the effect that the title is presumed to pass when the contract is made if goods are identified, and nothing remains to be done other than delivery and payment, and though, where something else remains to be done, the presumption is that it does not then pass, this presumption may be overthrown by circumstances indicating an intention that it shall then pass. The case of Young v. Mathews will be considered under the third ground relied on by the Gage Company. There is nothing in the case of Audenreid v. Randall having any particular bearing on this case. It has more to do with the validity of a sale against vendor's creditors. In a quotation from Southwestern Freight & Cotton Press Company v. Stanard it is stated that separation is enough to pass the property, though weighing, measuring, or counting may afterwards be necessary to adjust or determine the final amount of the price. I am not advised whether the Supreme Court of Missouri is one of the courts which does not hold in accordance with the majority of the courts that, where the price is to be fixed by weighing, measuring, or counting, the title is presumed not to pass until that is done. But the value of this quotation depends on the word "separation." If what the vendor has done is a real separation of the goods sold to vendee, I cannot see why the title should not pass, though the other thing remains to be done. But the placing the lumber in stacks as it comes from the saw as lumber conforming to that called for in the contract and with the view of applying it thereon was not a separation of it to the contract in the sense in which that word is used in the quotation. Until inspected according to said rules and determined to be such as the contract called for, it cannot be said to have been separated to the contract.

In the case of Martz v. Putnam the quality and size of the timber was ascertained, it was piled on the vendor's premises subject to the vendee's order, and was to be paid for as piled. Invoices were sent from time to time to the buyer, and it was fully paid for when the controversy arose. There was no provision as to any inspection. The court said:

"The rule that, if anything remains to be done, the property does not pass, applies to anything that is required to be done prior to the delivery of the property. In this case the property was delivered by the piling in stacks and from thenceforward it was held by the vendor subject to the order of the vendee."

This case certainly has no bearing here. In the case of Riddle v. Varnum, the lumber was delivered at the time of the making of the contract, and it expressly so stated. The measuring to ascertain the price, therefore, took place after the delivery. It is quoted by the Indiana court in Martz v. Putnam in support of the doctrine laid down in the above quotation from the opinion herein. The case we have here is one where there had been no delivery under the contract. It will be borne in mind all along here that I am not now considering the effect of the happenings relied on as constituting the third ground

on which the lumber is claimed. The case of McElwee **v.** Metropolitan Lumber Company, a decision of the Appellate Court of this circuit, is much relied on. The case is like the one in hand, in that the subject-matter of the contract was property not then in existence, but was thereafter to be produced, and the property to be produced was lumber. In no other respect does it resemble the case in hand. There a lumber company in May, 1892, sold the entire product of its mill in Michigan during the season of 1892. The amount of lumber manufactured during each month was to be determined by inspectors on the first day of the succeeding month, and the purchaser was to give his 90-day notes in payment of same less freight from the mill to Chicago. The controversy was in relation to lumber whose quality had been so determined and paid for. It was held that the title passed upon such determination and payment notwithstanding the lumber company was to deliver the lumber at Chicago, and there was to be another and final inspection after delivery began. Judge Lurton said:

"Though this agreement was originally executory being for the sale of lumber to be manufactured, yet when the product of a particular month was completed, and it had been inspected and measured, there was a complete bargain and sale of the lumber thus designated. That particular lumber became appropriated to the contract, and the vendee under the agreement was obligated to make his promissory note to the vendor for the price payable 90 days after date. The element necessary to a complete sale was supplied by the appropriation of a particular lot of lumber to the contract. In the absence of a contrary intention, clearly expressed, by other parts of the contract, the right to the property and of possession would vest in the buyer upon the execution of his promissory notes payable to the seller. The provision for a final inspection at Escanaba after the delivery had begun was merely for the correction of error before final settlement, and does not operate to defeat the presumption that title passed when the lumber was first inspected and accepted and conditional payment made."

No such appropriation was called for in the contract involved here. If the happenings relied on under the third ground amounted to an appropriation, it was an appropriation beyond any called for by the contract. The only appropriation called for by it was upon the inspection and measurement provided therein which was the only inspection and measurement contemplated. If the question in that case had been as to whether lumber sawed and stacked was the property of the purchaser before the monthly and preliminary inspection and conditional payment, it would have presented pretty much the same question we have here. The clear intimation of the case is that, under those circumstances, the property would not have been the property of the purchaser, but of the Lumber Company, the seller.

I do not think I need go through the other cases relied on by one as I have those thus far considered. I have dealt with those mainly relied on. No one of the other cases cited decide anything in conflict with the position here taken and are as readily distinguishable from the case we have here as those which have been considered in detail.

The necessities of this case do not require that I cite any specific authorities in support of the position I have taken. The whole subject is covered by Mechem in his book on Sales, to which I have

194 F.—13

.referred, so thoroughly, that I need go no further. I may say, however, that this case contains in the provision as to sawing and stacking $30,000 worth of lumber by December 1st to apply on the contract, a feature that I find in none other that has been cited by counsel, or that I have come across in my own investigation, and in so far it is possibly a novel case. But for the reasons heretofore given there is nothing in this feature calling for a disposition different from what would have to be made did it not exist.

[3] This brings me to the second ground relied on, and that is the alleged verbal agreement entered into at the time of the making of the contract. The claim is that at that time it was agreed by the parties that the lumber when sawed and stacked should become the property of the Gage Company subject only to measurement and shipment of same. That there was such an agreement is testified to by both the officers of the Gage Company and the bankrupt. It is, however, somewhat strange that such a position was not asserted when the claim was first presented. It was not asserted until later by way of an amendment. It appears also from the same testimony that the Gage Company desired to have the lumber marked as it was sawed and stacked as its property, but that the bankrupt would not agree to this. This has a tendency to negative the fact that any such verbal agreement was really made, and to show that it was merely talked about, and, upon the bankrupt's refusal to allow the lumber to be marked as the Gage Company's property, it was abandoned. This would account for its not relying on any such verbal agreement in the first instance; its being relied on at all being due to the stress of the case. But, however this may be, I am clearly of the opinion that the evidence is not admissible inasmuch as it contradicts the written contract. We have construed the written contract to mean that the title to the lumber was not to pass before it was inspected and measured. According to the verbal agreement, this was not so. It passed as soon as the lumber was sawed and stacked. Here is a clear and unmistakable contradiction of the written contract. Had the contract said in so many words that the title was not to pass before inspection and measurement, there could not be any possible question as to the testimony as to the verbal agreement being inadmissible. But, though this is not expressed, it is implied. And parol testimony is just as inadmissible to contradict an implied term of a written contract as an express term thereof. A good statement of the law to this effect is cited by counsel for the trustee from Page on Contracts, § 1189. It is to this effect:

"The rule that prior or contemporaneous negotiations cannot be used to contradict, add to, or otherwise vary a written contract applies not merely to the letter of the written contract, but also to its legal effect."

And an authority directly in point is cited by him, to wit, Van Winkle & Co. v. Crowell, 146 U. S. 42, 13 Sup. Ct. 18, 36 L. Ed. 880. I need not look further for authority on this point. Counsel for the Gage Company cites and relies on Hines v. Willcox, 96 Tenn. 148, 33 S. W. 914, 34 L. R. A. 824, 832, 54 Am. St. Rep. 823, and Quigley v. Shedd, 104 Tenn. 560, 58 S. W. 266, as conclusive of the question.

I do not think that either has application to the question before us. In the Hines v. Willcox case the written contract on its face was incomplete. It contained no undertaking on the part of the landlord. One of the recognized exceptions to the parol evidence rule is that it is admissible to supply omissions in an incomplete contract. In the case of Quigley v. Shedd the parol evidence was in accord with what the court construed the written contract to mean. It puzzles me to make out where there was any necessity for the parol evidence in that case. The written agreement did not need any such support according to the construction put upon it by the court, and it was recognized that it was the court's function to construe the contract. I think, therefore, that the Gage Company's claim to the lumber in contest cannot be made out on the basis of the alleged verbal agreement.

[4] There is nothing left, then, on which to base that claim except the happenings referred to. These happenings did not consist in the mere sawing and stacking of lumber to apply on the contract. I have considered the value of such happenings in what I have had to say as to the effect of the contract and the doing of the thing called for by it on the passage of the title. The happenings now to be considered went beyond the mere sawing and stacking of the lumber to apply on the contract. It is claimed they amounted to a setting apart and an appropriation of the lumber to the contract. Of course, if so, many of the cases cited and relied on by counsel for the Gage Company support the contention that the title passed on such setting aside and appropriation. But they differ from what we have here, in that there the setting aside or appropriation was made by the contract itself, whereas here the setting aside and appropriation claimed is by virtue of something that transpired subsequent to the making of the contract. The only setting aside or appropriation which the contract of September 6, 1906, made was upon inspection and measurement. It did not make the sawing and stacking to apply on the contract a setting aside or appropriation. If, then, there was an earlier setting aside and appropriation than upon inspection and measurement, it must have been because of something that transpired after the making of the contract. Such the happenings relied on are claimed to have been. Did, then, those happenings amount to an earlier setting aside and appropriation of the lumber to the contract than was contemplated by the contract; i. e., before inspection and measurement and after the lumber had been sawed and stacked to apply on the contract? To answer this we must know just what those happenings were. As heretofore stated, they took place at the lumber yard on two occasions in June, and on the 2d of September, and on one occasion at Cincinnati the last week of August. All of them had a common element, to wit, an order or direction to deliver lumber that had been sawed and stacked to apply on the contract. Those that occurred in the yard had in addition a survey of the lumber sawed and stacked that was applicable on the contract and an estimate of the amount thereof. Really the order and direction was not to deliver lumber that had been sawed and stacked to apply on the contract. It was to

deliver lumber of the character called for by the contract with the expectation of course that the lumber to meet the order and directions was to come from that which had been sawed and stacked. This was all that took place even on September 2d, when orders and directions were given sufficient to cover all the lumber in the yard that had been so sawed and stacked. It is to be noted in this connection that what took place on September 2d, no matter what its character may have been, can be of no avail to the Gage Company because a vesting at that time of the title to the lumber then in the yard was clearly a preference, as it then knew of the insolvency of the bankrupt. Such then was the character of the happenings relied on. It must be held that they did not amount to a setting aside and appropriation at that time of any lumber to the Gage Company. The orders and directions given were nothing more than it was contemplated by the contract would be given in the course of its performance. Notwithstanding them, the lumber was still to be inspected and measured as the contract provided. It is true that Palmer, one of the directors and managers of the Gage Company, who represented it on each of these occasions, testified that the lumber was set aside for the Gage Company. But that was merely his opinion as to the effect of what took place. When asked to tell what took place his answer was as for instance on the first occasion in June as follows, to wit:

"We went over the propostion very carefully, and went through the yard and took an estimate of the stock, the stuff that was put up for us, and gave an order for the shipment of some of it. Instructions had already been given to forward the lumber. We took an estimate of the whole yard."

This coincides with Jacobs' testimony as to what took place. I am not bound by Palmer's opinion. I must form my own and it accords with that of Jacobs that on none of these occasions was any lumber set aside or appropriated in the legal sense of those words to the contract.

In the case of Young v. Matthews cited and relied on by counsel for the Gage Company and which I passed for consideration until now, where it was held that the title to certain clumps of unfinished bricks had passed, though the seller was still to furnish them, it appeared that the object of the buyer as the seller knew was to obtain an immediate security, and with this in mind the buyer's agent said to the seller, "Are all these appropriated to my principal?" and the seller replied, "Yes." There was no such object here, as the Gage Company was not then suspicious as to bankrupt's financial condition. And no such thing was said here as was said there either in so many words or in effect. All that we have is the opinion of Palmer that as a result of what he says took place the lumber as it stood was set aside and appropriated to the contract.

I therefore conclude that the Gage Company has not established ownership on this ground. But these were not all the happenings that can be said to have any bearing on the question of ownership. There were certain other happenings which bear heavily against the Gage Company's claim of ownership of the lumber in controversy on either one of the grounds relied on. They took place on Sunday morning,

September 1st, in Judge Beckner's library in Winchester, in the lumber yard on September 2d, on the train from Knoxville to Clairfield on September 9th, and in the lumber yard the same day after the arrival of the train. They cover the action of Palmer, the Gage Company's representative. On the first occasion there was a meeting of the officers of the bankrupt, and Palmer was then present. It was then known that the affairs of the bankrupt had been wrecked. The only claim that Palmer asserted was an indebtedness of $20,000. He asserted no claim to any lumber. According to Mrs. Anderson, he said but little. He would shake his head, and say he was wiped out. In the lumber yard September 2d, the next day, he told the bankrupt's superintendent, Jacobs, that the bankrupt was in bad shape financially, and would go into a receiver's hands if some one did not come to the rescue soon, and that his company was a large creditor. He did not claim that the company owned any lumber in the yard, but, after having taken an invoice of all the lumber applicable on its contract, gave orders for enough lumber to cover it. He wanted Jacobs to ship all he possibly could, and gave him to understand that the more lumber they received the better shape they would be left in. The giving of these orders was simply to beat the receiver whose appointment was felt to be imminent and certain. The state receiver, Bartlett, after his appointment, went from Knoxville to Clairfield on the morning of September 9th. Palmer was aboard the same train, and Bartlett had a long talk with him. They talked about the bankrupt's affairs and the Gage Company's claim. The sole claim he asserted on behalf of it was an ordinary creditor. He asserted no claim to any lumber. The matter was discussed why the Gage Company had made such a large advance without any security. He stated that it had considered the matter of obtaining a mortgage or acquiring a lot on which to pile the lumber on, but for certain reasons given neither plan was adopted, and it was without security. Then in the yard after the train arrived at Clairfield, and before Bartlett as receiver had taken possession, Palmer ascertained that on one of his company's orders a car had been partially loaded, sufficiently so that the railroad would transport it, and, without waiting to have it fully loaded, got the inspector to let it be shipped, saying that the receiver would be up there in the afternoon, and this would stop the proceedings.

In view of all these happenings, it is impossible to think that Palmer at any time prior to then had any idea of claiming on behalf of the Gage Company that it owned any of the lumber in the bankrupt's yard.

For these reasons, I am constrained to hold that the trustee is entitled to a judgment for all the lumber in contest, and it will be so entered.